CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

BENJAMIN K. KLEINMAN (NYBN 5358189)
MOLLY K. PRIEDEMAN (CABN 302096)
Assistant United States Attorneys

1301 Clay Street, Suite 340S
Oakland, California 94612
Telephone: (510) 637-3680
FAX: (510) 637-3724
Benjamin.kleinman2@usdoj.gov
Molly.priedeman@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MANU SINGH,<br><br>Defendant. | CASE NO. 4:25-cr-00275-JST-1<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Date: August 28, 2026<br>Time: 9:30 a.m.<br>Court: Honorable Jon S. Tigar |

## I. INTRODUCTION

The defendant, Manu Singh, pleaded guilty to Count One of the captioned Indictment in violation of 18 U.S.C. § 1349, Conspiracy to Commit Wire Fraud, on August 7, 2026. The parties agree that the defendant's adjusted offense level is 14, the defendant's criminal history category is I, and, therefore, the defendant's Guideline sentencing range is 15 to 21 months' imprisonment. The defendant's Sentencing Hearing is scheduled for August 28, 2026, and the government recommends that the Court impose a sentence of 12 months and one day imprisonment, which is below the defendant's Guidelines. The reason for the downward variance is that, pursuant to the amended sentencing

Guidelines scheduled to go into effect in November 2026, the low-end of the defendant's Guidelines will be 12 months' imprisonment. Specifically, as noted in the plea agreement, "The parties agree that under the amended version of the guidelines that will take effect on November 1, 2026, the defendant's final offense level is 13, which is based on inflationary adjustments to the monetary table under § 2B1.1(b). Specifically, the defendant receives a four-level adjustment under § 2B1.1(b)(1)(C) instead of a six-level increase, and he is entitled to only a reduction of two levels under § 3E1.1." Plea Agreement, pg. 11, fn. 1.

On or about September 4, 2025, a three-count Indictment was filed in the Northern District of California charging the defendant with one count of Conspiracy to Commit Wire Fraud and two substantive counts of Wire Fraud. An arrest warrant for the defendant was also issued. On or about October 2, 2025, the defendant was arrested in Singapore and has been in custody since his arrest. Therefore, on the day of the sentencing hearing, the defendant will have been in custody for approximately 10 months and 26 days.

Ultimately, the government, the defendant, and U.S. Probation, agree that a sentence of 12 months and one day imprisonment is appropriate and sufficient but not greater than necessary based upon the sentencing factors set out in 18 U.S.C. § 3553(a), which are further discussed in the following sections.

## II. CONDUCT

The defendant was the founder and Chief Executive Officer (CEO) of Contrarian Technologies Ltd. ("CONTRARIAN"), a company based in India and registered in the British Virgin Islands that did business in the United States and elsewhere. CONTRARIAN purported to offer "market making" services for cryptocurrency projects. In reality, CONTRARIAN employees perpetrated a sophisticated market manipulation scheme in which customers paid CONTRARIAN approximately $3,000 per month to artificially inflate the trading volume and price of those customers' cryptocurrency tokens through wash trading. "A wash trade is a prearranged pair of trades of the same good between the same parties, involving no economic risk and no net change in beneficial ownership." *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 627 n.2 (9th Cir. 2018) (internal quotations omitted).

Wash trading created the appearance that CONTRARIAN's clients' cryptocurrency tokens had

active, organic trading markets (i.e. – there was real demand for them) at increasing prices, which induced unwitting investors to purchase those tokens. CONTRARIAN and its clients then profited by selling off the tokens at the artificially inflated price created by CONTARIAN's wash trading. In short, CONTRARIAN executed so-called pump-and-dump schemes with cryptocurrency tokens. First CONTRARIAN spread misleading market information through wash trading to create a buying frenzy and then sold its holdings of the token at the peak price. When CONTRARIAN stopped wash trading, demand for the token vanished and the price plummeted, which left the unwitting investors who had purchased tokens from CONTRARIAN with tokens that were worth significantly less than what they had paid for them.

The Indictment in this case was the result of an undercover operation by the Federal Bureau of Investigation (FBI) targeting illicit "wash trading" in the cryptocurrency industry. As part of the undercover operation, federal law enforcement created several cryptocurrency tokens, including the Powerlink token, which were launched and traded on a decentralized cryptocurrency exchange.

Ultimately, the Powerlink token was minted and traded on October 8 and October 9, 2024, on a cryptocurrency exchange. The defendant admitted in his plea colloquy that he and his employees executed the plan to wash trade the Powerlink token. For example, on or about October 8, 2024, the defendant sent the FBI Undercover Employee (UCE) a message, stating, "You may send us 50Million Tokens and $30K more worth of ETH. We'll gradually add that $30K to the pool resulting in a price appreciation of 200-250%." In this message, the defendant admitted that he was refining the plan to artificially increase the price of the Powerlink Token by using $30,000 of the UCE's funds to purchase the Powerlink Token on Uniswap. The defendant further stated, "We will need these funds to generate volumes and increase both liquidity and price," meaning that he required $30,000 from the UCE (in addition to the $9,000 retainer we already charged the UCE), to increase the trading volume and price of the Powerlink Token through wash trading.

The FBI's trading analysis corroborated the defendant's statement and revealed that substantially all the activity generated following the launch of Powerlink was the result of CONTRARIAN's wash trading. In total, there were 942 buy/sell transactions of the Powerlink token. Of this total, 922 (or 97.9%) of the buy and sell transactions were conducted by CONTRARIAN controlled cryptocurrency

wallets. There were just 18 organic trades from retail investors, which stemmed from 5 different cryptocurrency wallets and resulted in a loss to those investors of approximately $1,459.

As outlined in the plea agreement, the defendant admitted that he received retainer fees from approximately 17 different cryptocurrency projects. Additionally, the illicit gain from cryptocurrency liquidations following the wash trading of four separate cryptocurrency tokens, which were issued by his clients, was approximately $49,000.

## III. SENTENCING RECOMMENDATION

### A. Legal Standard

The United States Sentencing Guidelines serve as "the starting point and the initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; and
>
> (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B. The Government's Recommendation is Sufficient but not Greater than Necessary

There are several factors that support the government's recommended sentence of 12 months and one day imprisonment.

The defendant was the founder and CEO of the company and was in his mid-30s at the time of the offense. The defendant was not particularly young at the time of the offense, and he was in a leadership position in his small company. The government believes the defendant had, in and around 2023 and 2024, a total of 3 to 4 employees. As shown in the plea agreement, the defendant knew full-

well he was manipulating the cryptocurrency market and gained significant proceeds from his illicit behavior. The defendant's ill-gotten gains, which have not been recovered by the United States, were taken by duping unwitting investors.

In terms of specific deterrence for the defendant, he now knows that the government will seek to arrest, prosecute, and imprison him should he continue to perpetrate cryptocurrency wash trading schemes. The government believes that the defendant is unlikely to repeat the criminal conduct for which he was prosecuted, given the defendant's surprise at being arrested in Singapore and the nearly 11 months he has subsequently served in custody. Additionally, the defendant is not a United States citizen. Now, it is virtually certain that travel to the United States will be unavailable to him. Therefore, the government's recommended sentence accomplishes the goal of just punishment and specific deterrence for the defendant.

Regarding general deterrence, the government's recommended sentence sends a clear message that those who perpetrate cryptocurrency pump-and-dump schemes will be arrested, even if they reside outside of the United States, and serve significant time in prison. In conclusion, the recommended sentence indicates to the defendant and others who seek to profit from tricking and manipulating investors that their behavior will not be tolerated.

While the government does not have the benefit of a full PRS, there are several mitigating factors in this case. First, the defendant has no criminal record and has been in custody since October 2, 2025, including six months in Singapore. Second, the defendant has accepted responsibility at the first available opportunity.

//

//

//

//

//

//

//

//

## IV. CONCLUSION

For these reasons, the government recommends that the Court sentence the defendant to 12 months and one day imprisonment and a $100 special assessment. The government believes that supervised release is not needed in this case because the defendant will promptly be deported following his release from custody and is not expected to be readmitted to the United States.

DATED: August 21, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*/s/ Benjamin K. Kleinman*
BENJAMIN K. KLEINMAN
MOLLY K. PRIEDEMAN
Assistant United States Attorneys